IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GERALD CAUTHEN, *et al.*, : | |
| : | |
| Plaintiffs, : | Case No. 2:21-cv-03996 |
| : | |
| v. : | Chief Judge Algenon L. Marbley |
| : | |
| LUIS WEIL, *et al.*, : | Magistrate Judge Chelsey M. Vascura |
| : | |
| Defendants. : | |

**OPINION & ORDER**

**I.     INTRODUCTION**

In April 2020, The Gerald P. Cauthen 1995 Trust ("the Cauthen Trust") purchased a commercial office complex ("the Property") near Rickenbacker International Airport, a civil-military airport located approximately 10 miles south of downtown Columbus from The Offices of Rickenbacker, LLC ("Seller"). Leading up to the sale and during the diligence period, Luis Weil, the managing member of Seller, produced various documents about the financial status of the Property, including tax returns, income statements, leases, etc., to the Cauthen Trust, its trustee, Gerald Cauthen, and Cauthen's broker, Ben Marcus. Cauthen and the Cauthen Trust now allege that Weil failed to produce all the documents required by the purchase agreement and also that some of the financial documents he did provide contained misleading information. As a consequence, they assert that they were induced to pay an inflated price for the Property.

Now before this Court is Defendants' Motion for Summary Judgment (ECF No. 48) on Plaintiffs' five claims: breach of contract, breach of guaranty, fraudulent inducement, fraudulent and/or negligent misrepresentation, and unjust enrichment.[1]  At bottom, these claims present a

---

[1] The motion does not address Defendants' counterclaim.

1

classic case of buyer's remorse. Cauthen himself acknowledges that the missing documents would not have affected his valuation of the Property; the allegedly misleading financial statement had confusing labels but did contain accurate information—which was corroborated by other documents Weil provided and was explained by Weil in an email a month prior to closing. Accordingly, the motion is **GRANTED**.

## II. BACKGROUND

### A. Factual Background

The Property consists of two, single-story office buildings, located at 6425 and 6431 Alum Creek Drive in southeast Columbus. Seller, which is majority-owned by Weil, purchased the land in 2000 and erected the two buildings over the following years. Six businesses lease space in the buildings. (Weil Aff. ¶ 3, ECF No. 48-1).

In early 2020, Weil received a call from a real estate broker, Jay Zollars, inquiring about the availability of the Property on behalf of Cauthen. After Cauthen retired from a career as a transportation engineer, he turned his attention to real estate and acquired several properties, including several residential properties and a mobile home park, for the trust he had established in 1995. (*See* Cauthen Dep. 11:2–8, 11:21–14:9, ECF No. 54-1). But, over time, he became dissatisfied with the mobile home park. Many of the lots had stayed vacant, and the park was just close enough that he was tempted to visit and check up on it frequently but too far for those visits to be convenient. (*See id.* 13:5–8, 15:7–15). So he decided to sell the mobile home park and purchase a new property for the Cauthen Trust through a real property exchange pursuant to 26 U.S.C. § 1031. (*See id.* 15:20–24). For the new property, he set his eyes on something in the Columbus area, based on advice from his broker, Marcus, and several of his son's friends. (*Id.*

2

15:10–18). Marcus, in turn, reached out to a partner of his in the Columbus area. (*Id.* 24:24–25:1). That partner was Zollars.

Although the Property was not officially for sale, Weil was open to Cauthen's advances, and sent him a series of documents through Zollars on February 4, 2020, including: the January 2020 Rent Roll; statements showing revenue and expenses for 2018 and 2019; cash flow for 2019; and profits and losses and the budget for 2019. (Defs.' Ex. 4, ECF No. 48-1 at 27–33). A key point of contention is whether these documents accurately reflected the rent that Seller was receiving from the Property—and, specifically, the rent that Seller was receiving from US Customs, a major tenant at the complex. In 2017, US Customs expressed a desire to remodel the premises that it leased. While a tenant would typically pay office improvement costs out of its own pocket, Seller and US Customs instead agreed that Seller would pay the contractors directly for remodeling the space, and then recoup the costs from US Customs by temporarily charging higher rent. (*See* Weil Aff. ¶ 20, ECF No. 48-1). After Seller had been reimbursed fully for the construction costs, US Customs' rent would return to its prior, lower level. US Customs and Seller signed a new lease reflecting these terms on September 8, 2017.

The 2019 Statement of Revenues and Expenses includes a section titled "Ordinary Income/Expense," which listed just one category of income: "Rental Income" (*i.e.*, Category 5000). For the year 2019, the Property generated a total of $661,637 of income. Of that total, Seller received $463,221 in "Collected Rent" (*i.e.*, Category 5005), and a further $37,962 in "Tenant Improv Recovery" (*i.e.*, Category 5038). This was shown on the document as follows:

3

|  | Jan - Dec 19 |
|---|---|
| **Ordinary Income/Expense** | |
|   Income | |
|     5000 · RENTAL INCOME | |
|       5005 · COLLECTED RENT | 463,221 |
|       5026 · COMMON AREA MAINTENANCE | 142,219 |
|       5038 · TENANT IMPROV RECOVERY | 37,962 |
|       5030 · MISCELLANEOUS INCOME | 153 |
|       5031 · JANITORIAL INCOME | 9,413 |
|       5032 · ELECTRIC INCOME | 7,183 |
|       5033 · GAS INCOME | 1,487 |
|     Total 5000 · RENTAL INCOME | 661,637 |
|   Total Income | 661,637 |

(Defs.' Ex. 4, ECF No. 48-1 at 29). "Collected Rent" reflected the total amount Seller had received from its tenants in standard rent, *i.e.*, annually recurring rent. "Tenant Improv Recovery" reflected the temporary increase in rent that Seller was charging US Customs (and Forward Air, with whom Seller had the same arrangement) as reimbursement for the remodeling costs. (*See id.*). Although this temporary increase was effectively repayment for costs Seller had already incurred, Seller listed it under the "Rental Income" heading.

Separately, the rental income for the Property was also included in the January 2020 Rent Roll, another document that Weil had sent to Cauthen via Zollars in February 2020. This document reported the monthly rent payments that Seller had received for that month from each tenant. (*Id.*, ECF No. 48-1 at 28). In total, the Property had generated $38,893 in January 2020, corresponding to full year rental income of $466,716, a slight increase over the $463,221 in "Collected Rent" for 2019—which does not include the $37,962 that Seller had collected for "Tenant Improv Recovery."

The precise income figure is important because it is the basis for determining the operating income ("NOI") for commercial real estate. In turn, Cauthen and Marcus used the Property's NOI to calculate an appropriate purchase price. (*See* Cauthen Dep. 33:13–21, 125:3–14, ECF No. 54-1). Marcus suggested that Cauthen offer $4.4 million, a bit below Weil's asking price of $4.8

4

million. (*See* Defs.' Ex. 6, ECF No. 48-1; Cauthen Dep. 37:11–19, ECF No. 54-1). Weil accepted the offer, and the parties signed a Real Estate Purchase Agreement ("the Purchase Contract") in early April 2020. (Defs.' Ex. 1, ECF No. 48-1). The final purchase price was later reduced by $56,000 to account for repairs to the roof and HVAC system. (Defs.' Ex. 2, ECF No. 48-1).

Once the parties had agreed to the purchase price, Weil began sending additional documents to Marcus and Cauthen; as gathering all the documents took more time than expected for Weil, the parties agreed to several extensions to the deadlines that had initially been set in the Purchase Contract. On April 17, 2020, he sent via email: (1) a copy of the 2018 and 2019 tax returns for Seller; (2) copies of the service contracts for the Property; and (3) copies of tenant leases. But Marcus only received the 2004 Lease for US Customs and the first four amendments to that lease;[2] only the first page of the updated 2017 lease were sent over successfully. (*See* Defs.' Ex. 12, ECF No. 48-1). On April 23, 2020, Weil sent Marcus the full lease for Safety Occupational Testing, the tenant for Suite F, operating expense histories for the years 2012 through 2020, and a budget for 2020. (*See* Defs.' Ex. 15, ECF No. 48-1). And by June 6, 2020, Weil had prepared estoppel certificates for each tenant except US Customs, which had been delayed due to difficulties with receiving approval from the General Services Administration ("GSA"). (Defs.' Ex. 19, ECF No. 48-1).

Marcus and Weil also exchanged emails discussing various aspects of the documents during this period. In late June 2020, Marcus reached out asking to clarify some confusion expressed by Cauthen about the rental income drop-off from 2019 to 2020. In response, Weil explained that the approximately $38,000 difference was attributable to the fact that the tenant

---

[2] There were a total of nine amendments to the US Customs lease. The fifth and sixth amendments were both signed in the month preceding the closing of the Cauthen Trust's purchase of the Property; the seventh, eighth, and ninth were signed after the closing. In other words, only the first four existed at the time of Weil's April 2020 email.

5

improvement recovery reimbursement, which had previously been listed as rent, would be complete in 2020. Accordingly, US Customs and Forward Air (with whom Seller had a similar agreement vis-à-vis remodeling costs) would no longer be paying higher rent in 2020 and so total rental income would be lower in 2020 than in 2019. (*See* Defs.' Ex. 21a, ECF No. 48-1 at 101).

The purchase closed on July 24, 2020. (Defs.' Ex. 3, ECF No. 48-1). At that point, neither Cauthen nor Marcus had seen the 2017 US Custom lease. Weil had not had a chance to remedy his omission either, as it appears that Cauthen and Marcus were not yet aware that all but the first page of the lease had not been shared. They had also not yet received the estoppel certificate for US Customs, but Cauthen agreed to close without it. (Cauthen Dep. 65:3–18, ECF No. 54-1).

### B.  Procedural Background

When Cauthen and Marcus realized that $37,962 of the "Rental Income" the Property had generated in 2019 was attributable to reimbursement for remodeling costs, they came to believe that Cauthen had overpaid for the Property by about $500,000, in addition to higher interest rates on the loan and higher property taxes. (*Id.* ¶¶ 30–31). Consequently, Cauthen and the Cauthen Trust sued Weil and The Offices at Rickenbacker in this Court in July 2021. In their amended complaint, Plaintiffs allege five claims: (1) breach of contract (against both Defendants); (2) breach of guaranty (against Weil); (3) fraudulent inducement (against both Defendants); (4) fraudulent and/or negligent misrepresentation (against both Defendants); and (5) unjust enrichment (against both Defendants). (*See generally id.*). Defendants, in turn, filed a counterclaim, seeking a declaratory judgment in their favor. Defendants have now moved for summary judgment on all of Plaintiffs' claims. The motion is ripe for review.

6

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." This Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Summary judgment is inappropriate, however, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Evidence that is "merely colorable" or "not significantly probative" is not enough to defeat a motion for summary judgment, *id.* at 249, nor is "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position" sufficient. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

The initial burden rests upon the movant to present the Court with law and argument in support of its motion, and to identify the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56). Or, the movant can "challenge the opposing party to 'put up or shut up,'" *i.e.*, by "asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). The burden then shifts to the nonmoving party to set forth

7

specific facts showing that there remains a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (noting that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

## IV. LAW & ANALYSIS

Plaintiffs' allegations rest on three problems they identify with Defendants' conduct: (1) failing to provide a copy of the 2017 Lease for US Customs; (2) failing to provide the estoppel certificate for US Customs; and (3) providing misleading information about the Property's rental income. As explained in greater detail below, each of the three issues identified was not nearly as problematic as Plaintiffs allege. While Defendants' failed to provide the lease and estoppel certificates, the evidence does not show that the failure caused any injuries. And the documents Defendants provided on rental income may have been confusing, but were neither required under the Purchase Contract nor inaccurate—especially in light of the clarification that Plaintiffs sought and Defendants provided.

### A. Breach of Contract

A breach of contract claim under Ohio law requires a plaintiff to show: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff." *Wellington Res. Grp. LLC v. Beck Energy Corp.*, 975 F. Supp. 2d 833, 837 (S.D. Ohio 2013) (citation omitted). The Purchase Contract required Defendants to produce certain documents during the diligence period. But Plaintiffs allege that Defendants failed to provide two of the required documents and further provided misleading information in another of the documents.

8

As an initial matter, there is no serious dispute that Weil failed to provide the 2017 Lease or the estoppel certificate for US Customs. He acknowledges that, when he attempted to send the lease to Marcus, only the first page of the 2017 Lease was actually sent; the remainder did not make it to Marcus. He also acknowledges that he did not send, or have in his possession, the estoppel certificates for US Customs before closing. But the record shows that these failures did not have any effect on Plaintiffs' acquisition of the Property. Cauthen testified that he did not suffer any damages from not having the estoppel certificates for US Customs. (*See* Cauthen Dep. 64:2–6, ECF No. 54-1). That sentiment matches his conduct: when Weil informed him that there was a delay in procuring the certificates from GSA, Cauthen "decided to go ahead without them" and close the deal anyway.³ (*Id.* 63:5–6; *see also id.* 63:12–18). Cauthen was likewise unable to identify any information in the 2017 Lease that would have affected his decision to purchase the Property or the price at which the purchase was finalized. (*See id.* 93:1–6). Rather, though the additional drawings of the renovation work planned for the US Customs office space "would have driven home . . . the fact that this [was] an enormous amount of work," Cauthen denied "that having a lot of drawings would have tipped the scales" on the acquisition. (*Id.* 93:5–8). In short, Plaintiffs have not provided any evidence that Weil's failure to provide the estoppel certificates or the 2017 Lease, *i.e.*, two of the three alleged breaches of the Purchase Contract, caused any damages or losses—an essential element of a breach of contract claim.⁴

---

³ Moreover, the fact that Cauthen chose to close the deal without the estoppel certificate appears to constitute conduct clearly establishing waiver of the contract provision requiring Weil to provide the certificates prior to closing. *Cf. Thomas v. Nat'l Coll. of Va., Inc.*, 901 F. Supp. 2d 1022, 1032 (S.D. Ohio 2012).

⁴ Plaintiffs also suggest in a footnote that the provision of the 2017 Lease "would have exposed that Weil and a third-party company he owned was doing work for the tenant that he was improperly listing as rental income." (Resp. in Opp'n at 3 n.1, ECF No. 55). *First*, Plaintiffs have provided no evidence that the company contracted to do the remodeling was owned by Weil; in fact, the record establishes that that is not true. (*See* Weil Dep. 81:4–82:22, ECF No. 57). *Second*, as discussed in greater detail *infra*, Weil did not hide the fact that the money Seller received as reimbursement from its tenants for the remodeling work was being listed as rental income. Thus, any "exposing" of this fact by the 2017 Lease would not have provided Plaintiffs with new information.

A different analysis leads to the same conclusion for the third alleged breach of the Purchase Contract: in effect, that Weil over-represented the actual rental income of the Property by approximately $38,000. This allegation center on the 2019 Statement of Revenues and Expenses document, which reported financial information for the Property for the year 2019. (*See* Defs.' Ex. 4, ECF No. 48-1 at 29). As described earlier, the document lists "Tenant Improv Recovery" under the section heading of "Rental Income," and includes the $37,962 attributable to the former under the overall sum for the latter. Plaintiffs allege that this accounting misrepresented the actual financial state of the Property because "Tenant Improv Recovery" should not have been considered "Rental Income"; it was not true income, but rather reimbursement for expenses incurred. (*See* Pls.' Resp. in Opp'n at 8–9, ECF No. 55).[5]

Weil acknowledges that the way he listed revenue in the 2019 Statement of Revenues and Expenses is "confusing and probably outside of the common accounting practices." (Weil Dep. 70:18–19, ECF No. 57). He also acknowledges that "Rental Income" was an "incorrect description" for the sum corresponding to "5000 – Rental Income" on that document. (*Id.* 78:8–9).

But, as an initial matter, it is not apparent that any provision of the Purchase Contract has been breached here. Plaintiffs suggest that the Purchase Contract imposed an obligation on Seller to "provide [its] financial statements, including income statements." (Resp. in Opp'n at 3, ECF No. 55). The only provision of the Purchase Contract they cite in support of this assertion is Section 3, which required Seller to provide "all leases, service contracts, summary of unwritten contracts, survey, building plans, 2018 & 2019 tax return for this property, environmental phase 1

---

[5] Plaintiffs make the same argument with respect to the $9,413 listed for "Janitorial Income." (*Id.* at 8).

and 2 and any other deed restrictions or easements which directly affect the property." (Purchase Agreement § 3, ECF No. 47-1). Rental income, financial statements, or budgets are not mentioned anywhere in that list.

And even if a statement of the Property's rental income was required, the 2019 Statement of Revenue and Expenses accurately included all the relevant information. It listed the Property's "Rental Income," albeit with an accounting quirk. It listed the Property's "Collected Rent," *i.e.*, the actual rent that Seller received from the tenants; Plaintiffs do not suggest that the amount listed for this category was inaccurate. It listed the reimbursement amounts under a separate category, distinguishing it from regular rent. The only issue, in other words, was with how certain figures were labeled. On that front, Cauthen and Marcus had plenty of opportunity to ask Weil for clarification. In fact, they did ask. In response to Cauthen's concern that income was overstated in 2019, Weil explained over email that the "rent" for 2019 had included approximately $38,000 for tenant improvement recovery reimbursements from GSA. (*See* Defs.' Ex. 21a, ECF No. 48-1). He further explained that, as the recovery for construction costs was now complete, "[t]he total budgeted income for 2020 is $38,000 lower vs. 2019." (*Id.*).

In short, a month before closing, Weil directly addressed all of the points of confusion that Plaintiffs now allege were misleading about the 2019 Statement of Revenue and Expenses in an email to Marcus and Cauthen. He explained how he had listed reimbursement from the GSA for tenant improvement costs as rental income; he explained that the budgeted income for 2020 was $38,000 lower than in 2019; he explained that this was because the tenant improvement recovery would be complete in 2020. Neither Marcus nor Cauthen followed up on the explanation with further questions.

Weil had also provided Plaintiffs with other financial documents, including the 2020 budget for the Property, the January 2020 Rent Roll, and a written explanation of the income breakdown. The January 2020 Rent Roll shows that the Property generated $38,893 in rent for January 2020. This corresponds to $466,716 in rent for an entire year, effectively in line with the $463,221 listed for "Collected Rent" on the 2019 Statement of Revenues and Expenses, without the $37,962 in "Tenant Improv Recovery." In other words, considering the January 2020 Rent Roll alongside the 2019 Statement of Revenue and Expenses makes clear that the money received for "Tenant Improv Recovery" in 2019 was not income that the Property would continue receiving in 2020 and beyond.

In combination, the documents and explanation that Weil provided to Cauthen and Marcus did not constitute a "misleading" financial statement, which he was not even required to disclose under the Purchase Agreement. The documents provided included accurate figures, from which Cauthen and Marcus could determine the Property's rental income and thereby calculate an accurate NOI for the Property; confusion about labeling or categorization was clarified by Weil's email explanation.

There is no genuine dispute of material fact, therefore, as to whether Defendants breached the Purchase Contract by providing misleading financial statements; they did not. And there is no genuine dispute of material fact as to whether Weil's failure to provide copies of the estoppel certificate or the 2017 Lease caused any injuries or losses to Plaintiffs; it did not. As such, Defendants' Motion for Summary Judgment on this claim is **GRANTED**.

### B. Breach of Guaranty

Plaintiffs' breach of guaranty claim against Weil centers on the Weil Affidavit, a document that Weil signed on behalf of Seller and Cauthen signed on behalf of the Cauthen Trust. (*See*

Cauthen Dep. Ex. 19, ECF No. 47-14). The Weil Affidavit included several warranties: *first*, "Seller shall warrant that all invoices related to the tenant improvements subsequent to the sale of the [P]roperty are proper"; *second*, "Seller shall further warrant that in instances where there are differences in invoice amounts or for any other disputes related to tenant improvements Seller will take all such additional steps as are necessary to resolve the differences without involving Seller"; and *third*, "Seller warrants that the insurance coverage for tenant improvement work will be extended to indemnify Buyer and that the Seller will keep this indemnification in place until all tenant improvement work has been completed and approved by the GSA." (Cauthen Dep. Ex. 19 at 1, ECF No. 47-14). Plaintiffs allege that Weil breached these warranties.

In the first instance, Weil argues that he did not sign the Weil Affidavit in his personal capacity, and therefore that the document does not establish any personal guaranties that he could be held liable for breaching; Plaintiffs disagree. This Court need not resolve that issue today. That is because, even assuming *arguendo* that Weil signed the document in his personal capacity, Plaintiffs fail to state a cognizable breach of guaranty claim. As set forth in the Amended Complaint, Plaintiffs allege that "Weil represented and warranted that he would provide documentation regarding the true and accurate rental incomes for the Real Estate and provide all up-to-date lease documents for any tenants on the Real Estate" but that he failed to do so.[6] (Am. Compl. ¶ 51, ECF No. 42). But none of the three warranties in the Weil Affidavit—which are all about tenant improvement work—imposes an obligation to disclose accurate financial statements. Nor does Section 3 of the Purchase Contract, which Plaintiffs reference regarding their allegations

---

[6] Plaintiffs' response brief on summary judgment provides no further clarification as to what guaranties in the Weil Affidavit have been breached; this Court assumes that the allegations in the Amended Complaint control. (*See generally* Pls.' Resp. in Opp'n at 10–11, ECF No. 55).

13

that Weil is a personal guarantor of Defendants' disclosure requirements, make any mention of a personal guaranty. (*See* Purchase Contract § 3, ECF No. 47-1).

In short, no document establishes a personal guaranty by Weil that Seller would "provide documentation regarding the true and accurate rental incomes for the Real Estate and provide all up-to-date lease documents for any tenants." Accordingly, the allegation that Seller failed to do so, even if proven true, would not establish a breach of guaranty claim against Weil pursuant to the Weil Affidavit. Defendants' Motion for Summary Judgment on the breach of guaranty claim is **GRANTED** as well.

### C. Tort Claims

Finally, Plaintiffs bring three tort claims: fraudulent inducement, fraudulent and/or negligent misrepresentation, and unjust enrichment. Each of these claims presents a variation on the theme previously established by the breach of contract claim; they arise from the same facts and the same alleged wrongdoing, *i.e.*, Weil's failure to provide certain documents and his alleged provision of misleading financial information.

But, under Ohio law, it is well-established that "the existence of a contract action . . . excludes the opportunity to present the same case as a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (quoting *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981)). Put differently, "quasi-contractual claims, such as unjust enrichment, are unavailable when a contract exists." *Smith v. Liberty Mortg. Co., Inc.*, No. 2:19-cv-03547, 2020 WL 2494459, at *5 (S.D. Ohio May 13, 2020) (citing *Gascho v. Glob. Fitness Hldgs., LLC*, 863 F. Supp. 2d 677, 679 (S.D. Ohio 2012)). This is because "permitting a party who has a contractually defined right to recover economic damages to proceed in a separate action against a corporate officer who has provided false information would []

14

undermine the ability of the parties to allocate risks and duties by contract." *Universal Contracting Corp. v. Aug*, 2004-Ohio-7133, ¶ 21 (Ohio Ct. App. 2004).

Two conditions must be met for a plaintiff to maintain a tort claim arising out of the same actions as a contract claim: *first,* the defendant must have "also breache[d] a duty owed separately from that created by the contract," *Textron Fin. Corp.*, 684 N.E.2d at 1270 (citing *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976); and *second*, the defendant must have caused "actual damages attributable to [her tortious] acts . . . which are *in addition* to those attributable to the breach of the contract." *Id.* at 1271 (emphasis in original) (citing *Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*, 656 F. Supp. 49, 63 (S.D. Ohio 1986)).

Neither condition has been met in this case. Plaintiffs do not allege that Defendant breached a duty separate from the duties found in the Purchase Contract. In fact, the opposite is true: Plaintiffs explicitly specify that the duty to disclose that forms the basis of their tort claims derives from the Purchase Contract (and the Addendum to the Purchase Contract). (Am. Compl. ¶ 59, ECF No. 42; *see also id.* ¶¶ 71–74). No other duty to disclose is identified adequately.[7] Likewise, Plaintiffs do not identify any damages in their fraudulent inducement claim that are distinct from the damages they allege pursuant to the breach of contract claim.

Of course, a plaintiff is certainly permitted to plead theories in the alternative, *see Medpace, Inc. v. Vivozon, Inc.*, No. 1:21-cv-00480, 2022 WL 866276, at *2 (S.D. Ohio Mar. 23, 2022) (citation omitted), such as both unjust enrichment (or fraudulent inducement, etc.) and breach of contract, and then to conduct discovery, as Plaintiffs here suggest. This may be sensible where

---

[7] Plaintiffs also plead that Defendants independently "represented and warranted to omit to state [sic] a material fact relating to the Real Estate" without ever explaining the source of that representation or warranty; this Court presumes that this refers to the Weil Affidavit, which, as explained above, does not include any representations or warranties about the disclosure of rental income information. (*See id.* ¶ 60).

"[n]either the validity of [an agreement] as a contract nor the scope of the parties' seeming agreement has been established"—*i.e.*, where it is unclear whether there even exists an enforceable contract that would form the foundation of a breach of contract claim. *Id.* But, if it turns out that an express valid contract exists, then recovery under the theory of unjust enrichment is barred under Ohio law. *See id.* (citing *Robins v. Glob. Fitness Hldgs., LLC*, 838 F. Supp. 2d 631, 646 (N.D. Ohio 2012). So, too, is recovery pursuant to other tort theories barred. And here, there is no doubt that a valid contract exists; neither party disputes that fact. Recovery for a tort claim (whether it sounds in fraud, negligence, or unjust enrichment) is therefore barred, even if Plaintiffs were permitted to plead such a claim in the alternative at the preliminary stages of this litigation.

Because Plaintiffs' tort claims are so factually intertwined with the breach of contract claim that "the two cannot be separated, recovery cannot be had for both." *ITS Fin., LLC v. Advent Fin. Servs., LLC*, 823 F. Supp. 2d 772, 780 (S.D. Ohio 2011) (citation omitted). As a matter of law, Defendants' Motion for Summary Judgment is **GRANTED** as to the tort claims.

V. CONCLUSION

For the reasons stated more fully above, Defendants' Motion for Summary Judgment (ECF No. 48) is **GRANTED**. Plaintiffs' claims are **DISMISSED**.

**IT IS SO ORDERED.**

ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE

**DATE: August 22, 2023**